in rebuttal. All right, so Council for Appellants, please approach, I think, Mr. Flynn. Mr. Coleman, Your Honor. Oh, Mr. Coleman. All right. Thank you, Your Honor. May it please the Court. I'm Miles Coleman, and I represent the Lopez Appellants, who are seven individual Apache women and girls, all of whom are joining us in the courtroom here today. In my time, I'll focus on our religious liberty and parental rights claims. I'll be followed by Council for the San Carlos Apache Tribe, and then by Mr. Flynn for the Arizona Mining Reform Coalition. Council, please be reminded that the time shown on the clock is your total time remaining. Thank you, Your Honor. And of that time, I'd like to reserve two minutes for rebuttal. All right. The question in this appeal is whether Apache plaintiffs' religious exercise is substantially burdened when the government physically obliterates Oak Flat, ending their core religious practices forever. That question— Council, I've been on the Court about 20 years, and I've been involved in a variety of matters tangentially or directly related to the case involved. We've got some serious religious issues, mining issues and the like. This has been going on for a long, long, long time. But now we've got, from my perspective, with all these things that have been thrown against the wall, which are sincere, you still got the Mining Act of 1872, you have a recent act of Congress where Congress has weighed in, and then you have the question of finality. You have lots and lots and lots and lots of arguments that have been thrown on the wall, if I may say. What's your best one? What should we grasp onto here? There's just so many things that have already been litigated or turned or twisted. There's a lot of sincere folks who are genuinely injured by whichever way this goes. But if you were to say to our panel, this is our best argument, what would that be? Your Honor, in some ways, that's like asking me to choose my favorite child or my best child. Which one is it, by the way? I certainly won't admit to that in open court. But I can tell you this. The three arguments that I'll focus on this morning are, in our view, plain ways in which this Court could reach the conclusion that we've requested and award the relief. And that's because those are the three religious liberty claims we've raised, one under RFRA, one under the Free Exercise Clause, and one that wasn't raised or decided in Apache Stronghold, a pure Mahmood claim relating to the parental rights. What do we do with the fact that these issues were hotly contested before? They went to the en banc court. It was 6-5, close case, ruled against your clients, went to the Supreme Court. It was there for a long time. Two justices dissented. And so we had all this process. We're a three-judge panel. We're limited in what we can do. And it seems like some of these arguments are trying to ask us to undo not just circuit precedent, but actually en banc precedent. Two points in response, Your Honor. First, at least one of the claims, the parental rights claim under Mahmood, wasn't raised to and decided by Apache Stronghold. But even as to the others, we're not asking this Court, nor could this Court, overturn an en banc decision. But it certainly can recognize that intervening case law, namely Mahmood, has effectively abrogated or effectively overruled Apache Stronghold. How does it do that? I mean, it's a very different case than this one. Respectfully, Your Honor, I would argue it's not so different. Perhaps the facts differ in some respects, but not material respects. And the core elements of the analysis and the reasoning of Mahmood apply here. Your Honor, briefly, before I explain what those are, I would just note that, as this Court has often found, in fact, Your Honor, in the Coria v. Garland case, the facts need not be identical. The issues need not be identical. It's enough, as this Court wrote, that the reasoning of the intervening case, Mahmood, directed or directs a different approach in this case. And it certainly does. Mahmood diverges from this case and is clearly, or I should say Mahmood diverges from Apache Stronghold and is clearly irreconcilable with it in at least three ways. First, Apache Stronghold held that the touchstone of religious burden was coercion. But Mahmood expressly rejected any coercion requirement, saying that view was deeply chilling and alarmingly narrow. The second way in which they differ is that Apache Stronghold said that courts can't consider the distinction between subjective and objective intrusions when doing the burden analysis. But Mahmood, again, repeatedly and expressly, made the exact opposite point, making the... Counselor, are you basically saying that we're in a Miller v. Gammy situation, where, based on your analysis, Mahmood is distinguishable enough that we have to go a different way? At least as to the RFRA claim and the free exercise claim. The parental rights claim wasn't raised in Apache Stronghold and so isn't controlled by Apache Stronghold. But as to the RFRA and free exercise claims, yes, Your Honor. It's a Miller v. Gammy situation, which, too, I would remind the Court, is a flexible and pragmatic approach. Miller itself recognized that. And it applies when the intervening decision undercuts the mode of analysis of the prior decision. That's true here both in terms of the coercion analysis that I mentioned... Not only has to undercut it, it basically has to just eviscerate it. It has to be irreconcilable. Is that your position, that these points are irreconcilable? It is, Your Honor. And I wouldn't stand here and argue to you otherwise, unless I were firmly convinced that the two cannot be squared. I mean, you know, this is an important case. There's a lot of passions on both sides. People have really important interests at stake. But this issue, you know, went to the Supreme Court, which spent weeks, months, deliberating whether to take the case and then didn't do so. And Mahmoud specifically cabined, you know, puts to the side Ling, which was the basis for the Apache Stronghold en banc decision. So, you know, you've preserved this for further review to the extent, you know, that could be available. But it's tough to accept the position that we could just essentially reach a different result after all the process that already happened on what's essentially the same claim. A few points in response, Your Honor. Excuse me. First, I don't think the court can or should read anything into the fact that the Apache Stronghold cert petition was denied. I don't think the court should read anything. Well, we don't read anything into it, but we do have to read into the fact that it went en banc here and the result was what it was and the reasoning was what it was. That's right, Your Honor. And again, I don't see how you can read Mahmoud in any way other than squarely inconsistent, clearly irreconcilable with the reasoning. You mentioned Ling, Your Honor. That's exactly the point. The en banc Apache Stronghold case, Ling was the center tent pole that held up the entire tent. And Mahmoud said it doesn't apply in cases like this one, where there's objective, direct burden on a religious exercise as there is here. In Mahmoud, even a, quote, subtle interference was sufficient to constitute a burden. How much more so when there's complete, immediate, permanent destruction that will forever end these exercises? Your Honor, I see my time has almost expired and I do want to reserve a few minutes for rebuttal. All right, thank you, counsel. Mr. Goldman. Hey, good morning. Good morning. Good morning, Your Honor. Bernardo Velasco for the San Carlos Apache Tribe. May it please the Court. For centuries, Oak Flat has been a religious and cultural sanctuary for members of the tribe and their ancestors, where they commune with Apache deities, gather traditional plants and medicines, and honor ancestors buried there. The district court's order must be reversed to prevent irreparable harm and to ensure compliance with SELICA's requirements for tribal consultation and an IPA-compliant EIS that comprehensively addresses the impacts of a resolution's mine. I'd like to focus my time this morning on Seven County's affirmation or reaffirmation of the arbitrary and capricious standard for review of an EIS, a standard that the district court did not apply. Under controlling Supreme Court and Ninth Circuit precedents, an agency action is arbitrary and capricious when it lacks a supporting foundation, whether that be but recites and reaffirms them over and over again. For example, the State Farm Insurance case of the Supreme Court is quoted in Seven County, and there the Supreme Court clarifies that an action is arbitrary and capricious when it relies on factors not intended by Congress. And I think the corollary also applies when you do not consider factors required by Congress. Failure to consider important aspects of the problem, offering an explanation that runs counter to the evidence, or so implausible that it cannot be the product of agency expertise. To address Judge Smith's question to Mr. Coleman earlier, the most important issue in this case is how the district court approached the EIS and the flaws that were identified by Drs. Emmerman and Wells for the tribe. I want to illustrate this with one component of the mine operations. Resolution intends to pipe almost 1.4 billion tons of waste from Superior to Skunk Camp to be permanently housed behind a 500-foot-tall wall that's three miles long, a dam made of tailings. This is just upstream of the communities of Dripping Springs, the Gila River, and Hayden and Wickleman. And statistically speaking, a pipeline failure is a near certainty. Dam failure is a question of when. The EIS prefers this tailing storage facility, but it lacks the necessary foundation. And that's the key in what the district court did below, is that it didn't look at the foundation. It looked at the conclusions. And under an arbitrary and capricious analysis, the court's task is to examine the foundation and the foundational problems that a plaintiff might raise or identify. Counsel, let me ask you this. There were, of course, lots and lots of consultations that went on. Are we just to ignore those? Your Honor, it's true that there were a number of consultations, and a number of those took place before 2021 when the EIS was withdrawn. But the key on consultation is the Forest Service's own admissions that it made in writing on the record. And I draw the Court's attention to SCAT ER 1839 to 40. And there, in the notice of superseding agency action, the Forest Service recites, the act requires that the Forest Service engage in consultation with affected Indian tribes. On March 1st, the Department of Agriculture directed the Forest Service to rescind the FEIS and ROD. And it states that USDA's decision was made because additional time is necessary to fully understand concerns raised by tribes. But Counsel, doesn't Seven County say that how much to delve into any of these issues is the agency's decision and not a court decision? What Seven County does is it distinguishes between direct effects and indirect effects. The correction of sorts, and that's a direct quote from Seven County, the correction of sorts is how agencies draw the line or how courts review line drawing exercises between direct and indirect effects. And indirect effects are those that are not following directly from a project. So upstream and downstream effects. Here, the subjects that are raised by the tribe are all contained within the mandate of Celica. We're not looking at where something might happen in smelting or we're not looking at transportation in ocean-going vessels. We're not looking at effects at a remote that may follow on from the activity that's going on in and under Oak Flat. Instead, we're looking at the direct effects, subjects required by Celica, required by Congress for the Forest Service to analyze. Questions that were not analyzed. Counsel, were you going to address the mining appraisal claim? No, Your Honor, that's for the Mining Reform Coalition. All right. So looking at the foundation, the foundational problems, the tribe identifies that nine out of ten causes of pipeline failure, including the most common causes, corrosion, are not considered. There is no dam breach analysis. There is no emergency response and preparedness plan. Something that the Forest Service acknowledges in the EIS was intentionally postponed. We have a dam that's constructed from acid-generating and potentially acid-generating tailings, which contain 51 percent acid-generating or potentially acid-draining material, but is regarded as non-acid-generating, as in stable tailings that will not be subject to the elements, not be exposed to oxygen, and have a consequent failure. And I want to make clear that this is not a challenge to the conclusions. The challenge is not simply that the Forest Service should have reached different results or should have preferred different alternatives based on the evidence before it, but it did not have the foundation supporting its conclusions, whatever those conclusions may be. And again, seven counties' correction of sorts is to review the end, is to ensure that courts of appeal are not attacking the line-drawing exercise that agencies undergo or undertake. The next issue that I would move to, since we have time, is that the balancing of factors was erroneously conducted by the trial court or the district court. The key issue is, when comparing the hardships or balancing the hardships, the court's task is not to look at generalized policy motivations, why did Congress pass this statute, but to look at the specific harms that might result if an injunction is granted or denied. The court below did not do that. Instead, it simply approved what Congress had done in passing SELECA, which was not the analysis that was required. Instead, it was to look at potential harms. Those tip sharply in the tribe's favor. And I see that I'm running low on time, so I'd like to reserve the balance. All right, counsel. Thank you. Good morning, Your Honors. May it please the Court, Roger Flynn for the Arizona Mining Reform Coalition, the Intertribal Association of Arizona, and the other groups. I want to get to Judge Smith's question and Judge Rawlinson's questions. The best argument, we think the big legal argument from our point of view, is the appraisals. And the big legal issue is, when does the appraiser look at it? Is it the current situation with all those mining claims? They have lots of mining claims out there. 1872 mining law, Judge Smith, we've had cases dealing with that. Those don't apply after the appraisal is done. The appraisal is done in the future. The Desert Citizens case, really the leading case in the country on appraisal, says the highest and best use, which is the requirement of the federal standards and the regulations, the highest and best use is not found from the past history or present use of these lands, but from reasonably future probability. That's the Desert Citizens at 1182. So, in essence, counsel, if it were a private exchange, a willing seller and a willing buyer, that's how the appraisal is supposed to go, correct? Yes, ma'am. In fact, the standards, for example, if I beg the Court's indulgence, the federal standards, which Congress ordered specifically, thou shalt comply with the federal standards, it's in our volume 5 at 790, says, when appraising the federal land portion of the exchange, the regulations require that the appraiser estimate the value of the lands and interests as if in private ownership. Not today. It's federal ownership. And available for sale on the market. But, I mean, if it was in private ownership, it would still be subject to the claims. I think what you wanted it to be is within Resolution Copper's private ownership, because they're the only ones that own the claims. Well, that's the big legal issue, Your Honor. Does the mining law and do these claims survive the exchange? Federal mining law, it's black letter mining law, does not apply on private lands. You look at the privatization of the lands, the mining law, the claims are gone. Resolution could have, they have mining rights here. They got mining claims. They could have gone with the mine, subject to federal control and all those requirements. They chose not to. They chose to go the privatization route. And once they chose that route, mining law, mining claims, forget about it. You go to the future. So, I mean, just to understand the position, is it that once this land exchange went into effect that essentially they lost the mining claims? Well, they're gone as a matter of law. There's no more mining claims. It sounds odd. How do you reconcile that with the statute, right, the provision that says nothing in this section shall interfere with, limit, or otherwise impair the unpatented mining claims or rights currently held by resolution? What does that mean? That basically means if they chose, remember the statute, resolution could have chosen to go the mine route and not the exchange route. So that provision says if they didn't choose the exchange and went to the mining route, like other mines on public lands in the West, this law had nothing to do with that. It would go under federal law and things like that. If I may, Your Honor, for this conundrum, the federal standards, the next sentence at our Excerpt for Section 5 at 790 says, this is the order to what the appraiser should do. It says, this is an assignment condition that requires a legal instruction and creates a hypothetical condition. The federal land is appraised as if in private ownership to its highest and best use. So it seems odd, but once they propose the exchange, it's a hypothetical condition. You don't look at the current. You look at the future. And so that's what federal appraisals do. We pointed out the various standards in the regulations, so you don't look at the current owner. What's the situation after? And they did that for the other parcel. They said, well, yeah, after the exchange, the market is for copper. Everyone in this room knows, certainly the company knows, that the market is for copper. The mining withdrawal appraisal area specifically said, yeah, the market's for  But then you walk two feet over onto the mining claim zone, still the one big federal parcel, and all of a sudden the market is for surface use. There's going to be no surface use. The surface is going to be swallowed by a two-mile-wide crater. There's no surface use on the lands. It's for copper mining. So that is the legal error they did, was to value the future market as in private lands, no mining claims, no mining law, as surface use. It's not going to be used for surface. All of the evidence, the record, there's no dispute about this. Once those lands are exchanged, their proposal is for a huge copper mine. The statute provides roughly 5,500 acres of land that resolution copper is to transfer to the United States. It seems to contemplate that that is the arrangement. But if this were right about the appraisal, there's no way that that number of acres would remotely approximate the value of the copper. So is it not an inference from the statute that Congress, setting aside some of the other transfer, didn't seem to contemplate that what we have here is a transfer that's as valuable an appraisal as what you're suggesting? If that's all the statute said, Your Honor, that would be correct. But the previous three pages of the statute all talk about you have to meet the appraisal standards. You have to view the highest and best use. You have to meet the appraisal regulations. And also, there's the income capitalization approach, which they required, which requires the analysis of the value of the copper. So the specific requirements from Congress, I would say that the 55,200 acres, give or take, is the floor. But they have the equal value requirement, income capitalization requirement, the highest and best use, the desert citizen case. They all knew that this was the law. And so that requires the future. And it requires Congress specifically built in provisions that if copper mining ended up being more than they thought, well, how do you know if it's more than they thought without looking at the minerals in the first place? So it shows it right there, that subsection E. But they also said if it turns out that that 5,000 acres is not enough, the resolution is going to have to give some amount of land. We don't know because they didn't value the minerals. It's an enormous windfall for the company and at the expense of the American public. And so that's the issue is Congress, that's the floor. They also said if there's more, if the values are more, I mean, if you actually do the copper analysis, and it's not like they give, say there's $100 billion there. The appraisal is $100 billion. That's not how the income capitalization works. What you do is you take the revenue stream from the company. This is, I'm not an economist or an appraiser, but you subtract the cost, time value of money from economic school and all that stuff. And so it's way less than the $100 billion. But it's going to be a substantial amount. And Congress specifically said when you value those minerals, and eventually if the mine makes more copper and more money, the American public gets more land or money to buy more land. So that 5,200 is the floor. I mean, if the statute was that's it, we don't have much of a case. But they ordered all of the appraisal standards and regulations, the case law, and Desert Citizens clearly says don't pay attention to the current situation. You pay attention to what happens after. That's the legal issue here, Your Honor. Arbitrary and capricious legal error. They said that the appraisal is based on the current situation with federal mining claims. They no longer exist. If you find that the mining law and the claims exist on private lands, we lose. But if you find that the mining law and the claims do not survive the exchange and do not apply on private lands, then respectfully, we win. And so that's the legal issue. And Congress ordered those appraisal standards to be met. And I see about less than two minutes, and I'll save that for my rebuttal. All right. Thank you, counsel. Thank you very much. Robert Stander here on behalf of the United States Forest Service. Good morning, Your Honors. Good morning. May it please the Court. The plaintiffs have not remotely shown they meet the requirements for a preliminary injunction. And most fundamentally, their claims are exceptionally weak on the merits. The fact that they chose today to start with Lopez's attempt to relitigate Apache Stronghold tells you all you need to know about the strength of their claims. The district court correctly concluded they haven't shown serious questions, much less likelihood of success. If I may, I'll start with discussing the appraisal claim. The appraisal claim fails because a real estate appraisal must value the property that the seller owns and that the seller is conveying, and it must account for encumbrances on the  So, counsel, what case says that in this context, with specific instructions on how the appraisal is supposed to be conducted, that the appraisal is for the current use of the property? What case says that? Well, I think the place to start is... Could you answer that question? What case says that in this context, where there are specific regulations about how the statutory requirements and regulations about how the appraisal is to be done, says that you start with the current owner and the current use? What case says that? Yes, Your Honor. I think Desert Citizens itself proves the point for us. And if you look at the argument that Amrick is making there, it is a misleading argument attempt to confuse the court into adding property to the estate that the government does not own. And here's how it works. In their reply brief, Amrick has a block quote from Desert Citizens that includes the language, future use. And it's in bold, future use. That's exactly how the appraisal worked in this case. The current value of the property that the government owns, the surface estate, is based on the reasonably probable intended use, the future use of that property. It's supposed to be the highest and best use with a hypothetical owner and a hypothetical buyer. So how does that translate to the current owner? I can unpack that and explain that, Your Honor. So as I was saying, the appraisal based the current value of the property the government owns based on the future use. The future use, the appraisal said, of the property that the government owns, the surface estate, is as surface land in support of a mining operation. What you cannot do is add property to the appraisal that the government doesn't own. And here, of course, resolution owns the mining rights and the mining claim zone because of their unpatented mining claims. And Congress was well aware of those rights because it said so in the statute. As Judge Bress, you pointed out, subsection I of the statute has a non-impairment clause. It says nothing in this section, nothing in the Act will limit or otherwise impair resolution's unpatented mining claims. And that's exactly what Americ's interpretation does. It doesn't just impair them, it nullifies them. So you're saying the mineral deposits are owned by the company? They are absolutely owned by the company. It is a so. So the United States has no interest in those mining rights? That's correct. Let me be clear about this, Your Honor. Unpatented mining claims under the Mining Law of 1872 are real property rights in the full sense of the word that run with the land and survive conveyance just like any other incumbents. Well, doesn't Locke say that an unpatented mining claim, the United States retains ownership of the underlying fee title of the property? And what they own is naked title. What the place I would point to the Court to understand how the mining law works and what these property rights are is the United States v. Shumway. That's the case the district court discussed. That's 199F3, 1093. It discusses Locke. It discusses all of this. And these claims, what this is, it is a real property interest, a possessory exclusive right to enter the land and mine the minerals. So a person with this property right has essentially an easement and go on the property, exclude others from the property and mine. It's the same as any other easement. If I'm selling my house and there's a railroad easement in the backyard and a train running through the backyard, I have to account for that in the appraisal. No buyer is going to pay the same for my house with that railroad train going through their backyard. And when I sell the property, that easement stays with the property. And it's the same thing with these mining claims. Now, Counselor, I'm looking at 36 CFR section 254.2, 254.9B1, little 2, and it says, the value of the lands and interest as if in private ownership and available for sale in the open market. And consider the contributory value of any interest in land such as minerals to the extent they are consistent with the highest and best use of the property. And you're saying the highest and best use of the property is as surface land as opposed to mineral extraction? Well, I could explain what that regulation does. Would you answer my question? Are you saying that the highest and best use of the property is for surface land as opposed to mineral extraction? Yes. What I'm saying is that the highest and best use of the property that the government owns, which is the surface estate. It doesn't say that the government owns. It says the highest and best use of the property, period. So in this case, that's the property we're talking about. So you're saying that that property, the highest and best use is for surface land as opposed to as mineral extraction. That's your argument? So, again, what I'm saying is that. Is that your argument? Well, yes, Your Honor. An appraisal has to appraise the value of the property that the government owns. Exactly. Exactly. The government owns the surface estate. As if it were in private ownership, not as the government owns it. It's as if it were in private ownership. So what that regulation does, as if in private ownership, it means that the appraisal must account for the difference between privately owned land that's subject to State zoning and land use law versus Federal owned property that's subject to Federal land use regulations. And that's spelled out in the appraisal report at page 3. Where is that in the regulations? The point you just made, where is that in the regulations? It is the regulation we're talking about. What this regulation means and the appraisal. What says it means that? Let me point you to the appraisal report itself. Well, the appraisal report is what's being challenged. So, Your Honor, page 3 of the appraisal report. This is page 540 of AMREC's excerpts of record. It has a full page explaining what this means. But counsel, do you understand that that's what's being challenged? So for you to say that supports your argument begs the question. I'm asking you what case, what regulation supports that argument that the highest and best use of this property is as surface land as opposed to mineral extraction? What are you basing that on? The report is being contested. So the report doesn't get you, in my view, where you need to be. I need something from a regulation, a case or something. Well, first, Your Honor, let me help. I think what I'm explaining here is the agency's interpretation of its own regulation. So the agency's interpretation of its own regulation is there at page 3 of the report, and that's what it says. And what you can't do, the reason it means that, the reason it, as if in private use, doesn't mean what AMREC says it does is because doing that would obviously impair resolution's mining rights. It would nullify them. That's one. Two, it would add property to the United States as a state that the United States doesn't own. It would lead to the absurd result that resolution would have to pay the United States for property that it already owns. And the district court correctly rejected this as an absurd position. So both of those arguments, the future use argument and the as if in private ownership argument, conflict with the square text of the statute and basic principles of property law and basic principles of how an appraisal has to be done. I'll just reiterate one more time that that regulation, as if in private ownership, what the Forest Service's interpretation of that regulation, its own regulation is at page 3 of the appraisal summary. We're no longer bound by agency interpretation of their own regulations. So we are free to look at that without difference. And it's a very common sense interpretation. It makes perfect sense. It reconciles the fact that the regulations require an appraisal to account for all encumbrances. This is 36 CFR 254.9c4. It says appraisals prepared for exchange purposes must contain a statement of all encumbrances. The uniform appraisal guidelines, this is page 909 of Amrit's excerpts of record. It is improper to disregard preexisting encumbrances and their impact. So those are the regulations that say you have to account for mineral rights if they're encumbered, right? Yes, you obviously account for mineral rights. You have to account for who owns them. And when a private party owns them, you can't appraise them as if the United States owned them. If there are no more questions on the appraisal argument, I will turn to the NEPA claims. So the tribe stood here today and claimed that the most important argument in the case, the strongest argument, was the NEPA claim about pipeline safety and their proffered expert, Dr. Emmerman. That claim fails at every level. And the place to start with NEPA claims is the Supreme Court's decision in Seventh County from last year. That case has two holdings. The first is in Part 2a of the opinion. It holds that the central principle of judicial review in NEPA cases is deference. That holding applies across the board to all of the plaintiff's claims across all three sets of plaintiffs. And it's very clear, a quick read of the opinion walks through all of the ways that deference is required. What all of the claims do here, they do three things that are all impermissible under Seventh County. The first is that they, of course, ask the Court to ignore Seventh County and refuse to give deference. The second is that they pretend like the agency didn't respond to comments or didn't address some issue, when, in fact, the record undisputably shows they did. And that's what's going on with Dr. Emmerman and pipeline safety. And the third, of course, is these are just substantive disagreements. They brought in experts outside the record after the fact to make substantive disagreements with the agency. And a quick read of those declarations makes it very clear that that's really what's going on. As to Dr. Emmerman himself, the plaintiffs argue that the Forest Service didn't respond to his comments on pipeline safety and on corrosion in the pipeline. It's just not true. In response to Emmerman's comments, they added an 80-page pipeline safety plan. That's Appendix Q. There are 51 pages on pipeline safety at Chapter 3.10. There is a response to Dr. Emmerman. So Appendix R of the EIS, FEIS, is a response to comments. Page 306 directly responds to Emmerman himself about the pipeline, about corrosion, and says, we added this pipeline safety plan to the record in response to this. And we have here a claim that just flatly ignores this. If you look at the tribe's brief, pages 42 to 46, and then 48 to 49, it just regurgitates these expert declarations without ever citing the FEIS, without ever attempting to show that the FEIS didn't, in fact, address these things. It's just factually inaccurate. Not only is it factually inaccurate, but there are more. I'll just run these out. The response to comments, this is Appendix R, pages 321, 333, 334, 342, and 352, all responding directly to Emmerman, saying your comments are not, quote, not factually accurate, quote, erroneous, quote, not valid, quote, not valid. So it's just factually, it's false to say that the agency didn't do this. It's also an inappropriate request to this Court to ignore seven counts. And it's a disagreement on substance. There's a second holding of seven county. And that's in Part 2B, where the Court held that agencies are not required to assess the effects of separate projects that are either separate in time, separate in place, or outside the agency's regulatory authority. That holding applies most plainly to AMRIC's argument about water use by Superstition Vista's housing development, because that's a separate project. It's a housing development, not the mine. It's on state land. It's regulated by the state, and it's wholly outside the agency's regulatory authority, Forest Service. And so there is no requirement. There's a bright line rule in Part 2B of seven county, and that claim is foreclosed by that. Now, in its reply brief, AMRIC cites two cases that are no longer good law in support of that argument. Those are, it's page 49 and 52 of the reply brief, Tamoak Tribe v. Department of Interior, 608 F. 3rd, 592, and then Great Basin Mine Watch v. Hankins, 456 F. 3rd, 955. The cumulative effects discussion in those cases is no longer good law because, number one, the regulations on cumulative effects were rescinded last year by the CEQ, and two, afterwards, seven county held that as a matter of the statute, NEPA does not require agencies to do, to analyze the effects of separate projects combined with the project at hand. And there are a lot more of those cases out there that are pre-CEQ regulation, pre-seven county that do this cumulative effect, so I just urge the court to use caution when referring to those cases. Regardless of that holding in Part 2B, the superstition vistas claims fails anyway, just under ordinary deference principles, because the agency reasonably concluded that it did not need to assess to do quantitative modeling for water use by this future part of superstition vistas. And that's the argument that AMRIC makes, that the agency did qualitative assessment but didn't add this to the quantitative model. And the reason the agency gave for that was because, of course, it's speculative, it's a future housing development, they don't know how many people will live there, they don't know how much water it will use, and it doesn't have an assured water supply. How will this final EIS, if upheld, be used going forward? What is the relationship between this document and then other things that may come up later? There's a lot to come later. The statute forecasts that when it says in subsection C9B that the EIS will be used for future approvals and rights of way. And so it's essentially a programmatic EIS that will be used for those future projects. Would anyone who objects to those projects be able to challenge the EIS at that point? Of course. It will be able to challenge, you know, that's our point in this case, is that the proper time to challenge the EIS is when there's actual final agency action. And so when those decisions are made, they'll have their chance to challenge the EIS. But this is not the right time. I mean, I'm not sure that's right, just given the way the statute is drafted. You know, it's a sort of unusual statute. And when you're trying to fit the finality rules from NEPA onto it, this statute looks a little bit different. So, I mean, I hear you that there may be some aspects of the challenge that may not be right. I'm not sure, though, that any of the ones here are not right. And they're all, frankly, addressed in the EIS anyway. All the points we're talking about, about water, about, you know, the tailings, the experts, like, they're all already covered in the EIS anyway. Yes, Your Honor. So if you disagree with us on our threshold arguments, you know, we're happy, as we've discussed today, to go to the merits. We think we have compelling, overwhelming arguments on the merits. We're happy to win on those issues. I do think that the issue here isn't exactly ripeness. It's regressibility, and that the problem that plaintiffs have is their claims don't add up to, you know, enjoining the land exchange, because the land exchange is non-discretionary. All right. Thank you, Counsel. I see my time is up. And I'd ask the Court to immediately dissolve the administrative injunction after this argument and affirm the order of the District Court. Thank you, Counsel. Good morning. May it please the Court. I'm Michael Houston of Perkins Coie for Resolution Copper, the intervener. My colleague from the Department of Justice has ably explained why Judge Lanza correctly determined that none of plaintiffs' legal arguments even rises to the serious legal questions standard. I'd like to spend some time today talking about why the plaintiffs also cannot establish any irreparable harm that's going to occur before Judge — in the preliminary period before Judge Lanza can finally adjudicate those claims. But just before we get to that, I think it's important to spend a moment on where we are in the posture of this case. Even before the Court takes up the appeal of Judge Lanza's preliminary injunction order, I think the first task for the Court is to decide the plaintiff's still-pending motion for an injunction-pending appeal. That motion, as we know from the motions panel order, has never been resolved. And I think it's critically important that this Court resolve that motion expeditiously. Justice Barrett's recent concurring opinion in the Texas case indicated that an administrative injunction, where we — which we presently have in this case, typically should not last longer than about two weeks. Her conclusion was that two weeks should generally be about enough time for a panel to decide a motion for an injunction-pending appeal. Of course, this injunction has been in effect for 140 days. But, counsel, that's typical. This case is somewhat unusual in that if this action takes place, the entire sacred portion of this property will be obliterated. And so this is not a typical situation where, you know, the status quo ante doesn't necessarily have to be maintained. There is no way that this site can be restored if there's no injunction and it ends up being that it shouldn't have been obliterated initially. So why shouldn't that weigh heavily in terms of maintaining the injunction until the case has been decided finally? Two points in response to that, Judge Rawlinson. One is legal. One is factual. The legal point is that the Court, under the clear precedent of the Supreme Court of the United States, simply does not have legal authority to enter an injunction against the execution of an act of Congress without a finding that the plaintiffs are likely to succeed on the merits. And for all the reasons why we've been discussing, they're not likely to succeed on any of those claims. They can't even get to the serious question standard. So the Court simply can't put off consideration of the — based on a concern about the equities if there's going to be any injunction that persists after this oral argument. I think the Court has an obligation, per Supreme Court precedent, to find that the plaintiffs are likely to succeed on the merits and say what those things are. That's the standard for an injunction pending appeal. My — the second answer to Your Honor's question is, it is absolutely, categorically false that the Oak Flat is going to be obliterated if this Court lifts the administrative injunction. This is based on not only the statute, which requires Resolution Copper to preserve access to the Oak Flat campground for as long as it's safely possible to do so. The campground, by the way, the 50-acre camp — Well, so what does that mean, though, as long as it's safely possible to do so? Those are kind of some wiggle room words. Sure, Your Honor. What absolutely has no wiggle room and is totally unequivocal is the declaration of Ms. Victoria Pesey, the president of Resolution Copper. She has submitted a sworn declaration under penalty of perjury telling the Court that there is going to be no denial of access for the plaintiffs to the entirety of the currently Federal land for the next 10 years. In its current state? Yes. Yes, ma'am. Absolutely. And the — and that is important, too. Ms. Pesey has explained. The work that is going to happen on this site after it gets conveyed to Resolution Copper is going to happen either on land that's private, that we already own, that's not being transferred to Resolution, or it's going to happen on existing roads, existing drill pads. The work that Resolution is going to do for two years after we receive conveyance of title is underground exploratory drilling. And again, that's going to happen on land that already has been drilled for decades. It's going to happen on the same roads that exist right out there today. The exact same drill pads that are out there today. The same work that's been happening for decades. And so the plaintiffs say, well, our sacred area is going to subside. That's not going to happen for 16 years. That's certainly long enough for the proceedings in this case to get a full and fair hearing. Of course, we're here on a preliminary injunction. The question is not are the plaintiffs going to experience harm at some point in the distant future. The relevant legal question is will the plaintiffs experience irreparable harm before the district court has a chance to adjudicate their case, or as most relevant to the injunction pending appeal, before this court has an opportunity to resolve the appeal. P.C.'s declaration is unambiguous. There's going to be no denial of access. They have the very same access they will the day after the land exchange for 10 years that they have today. And the work that Resolution is going to do is not going to interfere in any way with sacred ceremonies or disturb the site. There's not going to be some scrambling of the egg that can't be put back together. The plaintiffs' character is when they say there's going to be, quote, immediate harm, what they're talking about is harm from the construction of the mine, which is, as Ms. P.C. explains, more than a decade away. So I think that that powerfully reinforces that in addition to the fact that the plaintiffs haven't shown a likelihood of success on the merits, not even serious questions, as Judge Lanza found, they also haven't demonstrated irreparable harm that they would need to do in order to be entitled to an injunction. I want to spend just a moment reiterating the final agency action point that I think is also important to this court. I heard my friend from the tribe say that he thinks, you know, the claim that should be decided is the NEPA claim involving pipeline failures. Well, that just reinforces what we currently have from the agency is a draft record of decision with respect to the permit that resolution has requested to build the tailings pipeline. There's current — that's a draft. It's going to become final after the agency completes the work it's doing now, which is the evaluation of the objections, including from my friends on the other side. The agency is working through those. It's going to put out a final record of decision, making a decision about where the tailings pipeline can be located and what it needs to do. If the plaintiffs believe that the tailings pipeline decision, when it becomes final, doesn't take account of their objections and that the FEIS continues to be deficient, they can absolutely raise those questions at that point. Counsel, why is it called a final EIS if it's not final? Well, it's final — it's the government's evaluation of the environmental impacts of the project. But it's very clearly not final with respect to the decisions that the government needs to make on discretionary items like permitting, like water, like a construction of a power line. And I think, as Judge Brest pointed out, this statute is unusual. But it's important to take account of the most important feature of the statute, which is Congress created a compromise. Congress decided this mine is going forward. We, the Congress of the United States, pursuant to our constitutional authority to manage Federal land, have decided we are going to build this mine. We are going to transfer this land. But we're going to have an analysis of the environmental impacts of that decision. And just as importantly, when that environmental analysis is complete, no more than 60 days later, the land must convey. But that doesn't mean that the final environmental impact statement is not final. Well, it's not final, clearly, Your Honor, with respect to the discretionary decisions that the agency is going to make about pipelines, about tailings facilities. But that's always true when you have a final environmental impact statement. There are still decisions that have to be made about implementing it. But that doesn't make the decision less final. Well, it's, but I think, again, Your Honor, we know from Section C, P, C9B of this statute what is the purpose of this FEIS. And the statute tells us the purpose of the FEIS is not to determine whether to convey the land, whether to build the mine. That's very unusual. In a NEPA case, the agency would typically make it, be making a decision about whether to green light a project. This agency doesn't have the authority to consider whether to convey the land. It shall convey it. But part of the statute is compliance with NEPA. And in that context, the environmental impact statement follows the same pattern as if it didn't have this mandatory obligation, because the requirement is to comply with NEPA. And so if the environmental impact statement is done, it's done according to the NEPA requirements. And under those requirements, when the agency completes its review, it dubs it a final environmental impact statement. And I don't see anything in the statute that would negate that label. If the agency didn't want it to be final, they didn't have to call it final. I understand that point, Your Honor. And I think when NEPA review is going to be undertaken, as we know from the Supreme Court's decision in Sevin County, as we know from this Court's precedents applying Sevin County in Cascadia Wildlands, the chief principle of judicial review when you're doing that NEPA review is deference to the agency. I take it you'd agree that there would be some aspect of this could be final? There could be some piece of this challenge that could be final? Or are you actually saying, no, none of this could be challenged at all? There's not any. What can't be challenged is the decision to convey the land exchange. The plaintiffs absolutely have a cause of action, Your Honor. They can go to the court and say, the agency's conclusion with respect to the tailings pipeline is deficient and the agency needs to be ordered to do further analysis. They're not going to be able to get over the deferential standard of review that Sevin County mandates. But as a matter of procedure, they could make that argument. We're not saying there's no judicial review available. What we are saying is the conclusion, the argument, what they cannot get through that argument is an injunction against the land exchange because there is no amount of additional study or process or consultation that the agency could undertake that could ever get to the conclusion, could ever get to a judicial order not to convey the land. Congress made this decision. I understand, Your Honor. Could they get an order that says this EIS needs to be improved in some way? They could get an order that would direct a remand to the agency to undertake further analysis. But importantly, they could not get an order that would vacate the FEIS. And that's because Sevin County teaches that the touchstone for the NEPA judicial review is the agency's decision making. And as I just mentioned, there is no amount of additional process the agency could be ordered to undertake that it could ever say we're not conveying the land. I mean, the finality questions here are interesting legally. I just don't know whether they're really presented here in the sense that I think the more specific the claim is, the greater the reason there is to question the finality. But a lot of the things, I think everything we're talking about, frankly, is written in the EIS. And we can evaluate the EIS for what it is, which is as a programmatic document. It's not supposed to be deciding individual specific pieces of the project. It's a programmatic document. And one should evaluate it on those terms in conducting the NEPA analysis. But it would seem that it would be final as far as it goes. So I understand. But of course, under Bennett v. Speer, Your Honor, the fact that the agency has no more to say is not the end all, be all for final agency action. You also, under this Court's precedents, have to identify a discretionary decision that the agency is making. And I think that's where these claims fail. And the reason you know that, again, is because of 539Pc9b, which is the provision where Congress in an unusual manner told you what this particular FEIS is for, not a decision whether to convey the land, not a decision whether to build the mine. As to those things, the statute says the agency shall convey within 60 days. This FEIS is for the purpose of making discretionary subsequent decisions. And I just, so I want to reiterate in closing just the fact that this, the Congress has said that this land exchange needs to close no more than 60 days after the FEIS. We're well past that. I would respectfully ask the Court to enter a rebuttal. Counsel, you've exceeded your time. Thank you. We understand your position. Rebuttal. Thank you, Your Honor. Two points briefly in rebuttal, one to the resolution and one to the government. First, in response to resolution's argument that there will be no irreparable harm, three points in response. Your Honor, you're absolutely right. Once the horses are out of the barn, they can't be put back in. Second, immediately upon the transfer of the land, the Lopez appellants and the others lose a statutory right to access that land. That's a meaningful harm and a meaningful loss. And third, resolution emphasizes that Ms. Pesey's affidavit is unambiguous. Maybe, but you know what else it is? Unenforceable. After 150 years, you can understand why the Apaches may be reticent to trust someone who says, just trust me, I'll let you use the land. Next, in response to the government's claim that we're merely trying to relitigate Apache stronghold. Not true. We brought one claim that wasn't raised, wasn't decided, and isn't controlled by Apache stronghold. It's a pure Mahmoud claim. As to the others, we're not relitigating it. We're saying it was wrong then and it's more plainly wrong now. This case has more in common with Mahmoud and Yoder than it does with Ling. That's why the Mahmoud court distinguished and didn't rely on Ling. Just like Mahmoud, this case involves an internal government decision as part of a government program on government land. And just like Mahmoud, the decisions in this case will pose an objective burden on the Lopez plaintiff's parental and religious liberty rights. Ling didn't involve that. That's why Ling wasn't relevant in Mahmoud. That's why Ling isn't relevant here. And that's why the Apache stronghold court erred and diverged from Mahmoud's reasoning in relying on Ling. Your Honor, for these reasons and those in our briefs, we'd ask that you grant the injunction pending appeal and ultimately reverse and remand for the entry of a preliminary injunction. Thank you, counsel. Just a few points in rebuttal. The central principle of Seven County is deference, but Section 2A makes clear that deference is the arbitrary and capricious standard. It recites public citizens, state farms, Stricker's Bay, Baltimore Gas and Electric, and many more cases, none of which where you will find a red flag next to that case. There is not a new standard. There is not a new explanation of deference. It is the same standard that has existed. Regarding irreparable harm, Mr. Coleman aptly addressed the harms will be suffered immediately, but we identify five harms that are cemented upon the transfer of Oak Flat, and that makes it necessary for either the motion for preliminary injunction pending appeal to be granted or for the district court to be reversed or both. There is also some confusion of a claim that's brought under Salika versus under NEPA. This is not a NEPA process that has been directed full stop. That could have resulted in no EIS or an EIS only covering certain portions. Instead, an EIS compliant, a NEPA compliant EIS has been required, and as counsel stated, when that analysis is complete, that is when the transfer should occur. That is our position. The analysis is incomplete. The foundation is lacking, and because that foundation is lacking, the condition precedent in Salika has not been met or satisfied. And then finally, turning back to consultation. Consultation is necessary. That is the position of the Forest Service in 2021. Not that it was advisable or appropriate, desirable, but necessary. This is an unqualified admission, and no substantive consultation ensued. Because no substantive consultation followed, that means there's no compliance with 539Pc3b, where the United States was required to consult then with Resolution Copper to find appropriate ways to address the harms to the tribe and its interests. The United States did not act within its trust responsibility to the tribe, and for that reason, both the consultation and the analysis of a NEPA compliant EIS fail, and this court should reverse the district court. Finally, if this court decides to lift the stay or to affirm the district court, the tribe will be filing papers with the Supreme Court, and so we are respectfully requesting an administrative stay to allow us the time to do that. Thank you. Thank you, counsel. Your Honors, in rebuttal, thank you. Heard a lot about mining claims and mining rights and case law under the mining law. Irrelevant. It does not apply on private lands. Congress, there's one federal parcel here. It's in two sub-parcels, but there's one federal land definition. It's the 2,400 acres that are going to be given away to, exchanged away to resolution. There's no difference. The Congress didn't say, oh, this plot of land use mining law claims, and you value the copper, and over there, you do it with copper, but that's what they did. There's nothing in the statute of legislative history we didn't even get into where the Forest Service said repeatedly in the House report and their testimony, we have to value the minerals. We have to value the minerals. Yes, sir, Congress. That didn't happen. They can't now post hoc say, well, that doesn't apply because there are encumbrances. That survived the exchange. The encumbrances don't survive the exchange. It's private land. Judge Rawlinson's questions. Where's the, excuse me. I just don't follow that. I mean, the encumbrances are the encumbrances. I don't see why, how the statute can just override the encumbrances. They had an example, like if, say, there was a right of way on the federal lands, an oil and gas pipeline or something, and then the feds exchanged that to somebody, to resolution. Well, that oil and gas company wouldn't lose its right of way because that's there. But that's a, mining claims are not, they're a unique form of property. As the Locke case said, Judge Rawlinson's, the feds own the minerals. They have a claim to ask for a mine. They haven't done that. And so the encumbrances do not survive. It's not like a right of way or something like that because that law that gave the right of way survives. The right of way survives the exchange. The mining claims do not survive the exchange. There's no case law that says that. They came up, they said, well, our appraisal standard says that. Well, just because it says that, as Judge Rawlinson said, doesn't mean it's true. There is no mining claims or mining rights on private land under federal law. It just doesn't exist, Your Honor. And that's the heart of the case. And that's where the appraiser got it wrong. If you find that the mining law and the claims survive the exchange, we lose. If you look at the mining law and public land law, if they do not survive under the appraisal standards, again, the standards were ordered by Congress. There's no deference to the federal standards. They were written by the Appraisal Foundation, chartered by Congress. No deference there. They just ignored them and just valued copper or devalued copper. And so that's the heart of the case, Your Honor. Do the mining claims survive? It's not a pipeline that was granted under another authority. They don't survive. And that's the key. The appraisal got it wrong on that. And I think I'm out of time, I believe. Yes. You've exceeded your time. Thank you, counsel. Thank you for your time, Your Honors. Thank you to all counsel for your helpful arguments. The case just argued is submitted for decision by the Court.
judges: RAWLINSON, SMITH, BRESS